GILLETT *v.* GILLETT.

1. ATTORNEY AND CLIENT—DIVORCE—DISQUALIFICATION.

Motion to disqualify attorneys for plaintiff in suit for divorce who had represented defendant herein in a former divorce case *held*, properly denied where there is no showing the attorneys could or did betray any confidence and the two suits bore no relationship to one another.

2. DIVORCE—EXTREME CRUELTY—CHILDLESS MARRIAGE.

Decree of divorce to 67-year old husband on ground of extreme cruelty is affirmed on appeal of 55-year old wife, where there are no children of the marriage and record shows the relationship has become unbearable, though plaintiff is not at all free from blame.

3. SAME—DIVISION OF PROPERTY—MODIFICATION OF DECREE.

Division of property between parties to a divorce suit pursuant to which husband received $16,425 and wife $8,050 is modified on appeal to grant her, in addition, a $1,500 mortgage or its equivalent for permanent alimony and in release of dower, where husband is not free from blame for the marital difficulties, she is 55 years old and her health and vision seriously impaired (3 Comp. Laws, 1929, § 12745).

Appeal from Kent; Verdier (Leonard D.), J. Submitted October 9, 1934. (Docket No. 109, Calendar No. 38,055.) Decided December 10, 1934.

Bill by George P. Gillett against Mary Edna Gillett for an absolute divorce. Cross-bill by defendant against plaintiff. Decree for plaintiff. Defendant appeals. Modified and affirmed.

*Linsey, Shivel & Phelps* and *John H. Vander Wal,* for plaintiff.

*Fred P. Geib* and *Cornelius Hoffius,* for defendant.

BUTZEL, J. Charging extreme cruelty, George E. Gillett filed a bill of complaint against defendant, Mary Edna Gillett, for an absolute divorce. Both parties had been previously married. After a two-year courtship they had obtained divorces from their respective spouses, and on September 21, 1922, shortly thereafter, were married, plaintiff at that time being 56 years of age and defendant 43. Defendant had been a trained nurse, and each owned a small amount of property. Defendant had expressed misgivings as to the permanency of their union, but accepted plaintiff's assurances that he would remain faithful. The latter admitted that he had been arrested for illegitimate parentage prior to his marriage, but the chancellor refused to permit defendant to testify as to what plaintiff had told her in respect to the accusation. The parties were thrifty and apparently lived happily together for upwards of seven years. Defendant was a good housekeeper and took excellent care of plaintiff's mother during her last illness, and also of plaintiff. Plaintiff charges in his bill of complaint that difficulties arose about three years prior to 1933, when he filed the

bill. The testimony, however, indicates that there were some matrimonial disturbances even two years prior to that time. The main difficulties arose because of plaintiff's attentions to a young girl who lived a large part of the time with an old lady who was an intimate friend of defendant's mother. Plaintiff became acquainted with the old lady through the defendant, and made frequent visits to her home, at times accompanied by the defendant. Plaintiff was also very friendly with the girl's parents and promised to help her father secure steady employment by purchasing a farm which the latter could work on shares. Defendant's suspicions were aroused by plaintiff's friendship for the young girl. and the attentions that he bestowed upon her, which did not appear to be entirely platonic. The girl sent plaintiff letters which were intercepted by defendant, and he finally rented a private postoffice box. He also removed his belongings from a safety deposit box held jointly in the name of himself and wife to one to which he had sole access. Defendant saw plaintiff and the girl conducting themselves in such a manner as to arouse her suspicions, although there is no testimony whatsoever of any serious wrongdoing. Defendant made futile remonstrations both with plaintiff and the girl's mother. On one occasion, when plaintiff and defendant went for a visit to the old lady, plaintiff and the girl were sitting or lying on the grass, and when defendant asked plaintiff to come in and visit with the old lady, the girl looked up and said, "You would like to get me out of here, wouldn't you?" A number of letters written by plaintiff to the girl were destroyed prior to the hearing. However, two letters written by the girl were introduced in evidence. They appear childish, stupid and harmless. The entire testi-

mony in the instant case shows no more than minor improprieties on the part of plaintiff and the girl.

During the latter years preceding the filing of the bill, however, defendant's suspicions became more and more aroused. She probably exaggerated the seriousness of plaintiff's conduct. She claims that she was fearful for him because of her knowledge of his character. There is no question but that defendant was ill a part of the time, particularly during one summer when plaintiff left her. She also suffers from cataracts, and has only one-third normal vision. Plaintiff also is not well, suffering from diabetes. Quarrels were frequent—on account of plaintiff's diversion of his mail from his home to a postoffice box, the removal of his belongings to a separate safety deposit box, his frequent absence from home, sometimes absolutely justified in his efforts to secure gainful occupation. The scenes at home became impossible. At one time defendant attempted to deflect the wheel of the car in which she and plaintiff were riding down a hill, so that disaster would have followed had not the wheel been quickly righted by plaintiff. On another occasion defendant feigned suicide. It is further claimed that she struck plaintiff, threw dishes at him, and altogether showed a most violent temper; that she called him opprobrious names, of which plaintiff for a period kept meticulous count, making a record of the number of times a certain appellation was used. While the divorce proceedings were pending, defendant complained to the authorities, with the result that the juvenile court officer investigated the conduct of the girl just prior to the hearing. Defendant does not deny many of the charges, but excuses them on the ground that she was sick and overcome by "nerves." She claims that she was

fearful of losing her husband through the transfer of his affections; that she believed designing people were attempting to get hold of him; that she did not want to lose her rights in his property and the guarantee of his support in her declining years, through the machinations of others. The trial judge denounced defendant, calling her an untamed shrew, and granted plaintiff a divorce. He awarded to the defendant plaintiff's one-half interest in certain property in which she already owned the other half interest in her own right, through purchase with her own funds.

Defendant claims on appeal that the trial judge should have granted a motion to disqualify plaintiff's counsel because the latter and his firm had represented defendant in her previous divorce action over 11 years prior to the filing of the bill of complaint in the instant case. There is no showing whatsoever that plaintiff's counsel would or did betray any confidence. While the two suits were similar in character, they bore no relationship whatsoever to one another and the trial judge properly denied the motion.

Defendant further claims that the court should not have granted a divorce because the acts complained of were not motivated by any malevolence on her part, or by the desire to do plaintiff any harm, but rather were due to defendant's physical condition and consequent mental state, which was considerably aggravated by plaintiff's conduct. We have frequently refused to grant a divorce where the parties are both at fault. See *Vardon v. Vardon,* 266 Mich. 341, and cases therein cited. The instant case, however, is not free from doubt. There are no children of the marriage, and the relationship of the parties, as shown by the record, has become so unbearable that we are constrained to concur in the

decision reached by the trial court to grant the divorce.

We believe, however, that in view of the circumstances of the case a more equitable distribution of the property should be made. Plaintiff is 67 years of age and suffering from a serious illness; defendant is 55 years of age and not at all in good physical condition. Plaintiff is not at all free from blame. He knew that his wife had reached an age in life when she was ill for a considerable period, and that her vision was greatly impaired by cataracts. He also was aware that his relationship with the young girl was such as to arouse his wife's suspicions. It may have been merely a harmless friendship, but he knew what unhappiness and grief it was creating. Although defendant's cruelty was of such a nature as to justify the granting of a divorce to plaintiff, nevertheless, in awarding alimony, we cannot overlook plaintiff's conduct. This is not a case where one party is without fault and the other is guilty of gross misconduct. Defendant, if possible, should receive sufficient so as to provide for her suitable maintenance and support in accordance with 3 Comp. Laws 1929, § 12745. Defendant's physical condition is such that she will undoubtedly have great difficulty in making a living. This is equally true of plaintiff. We do not believe that either of the parties should become public charges.

At the time of the hearing plaintiff in his own right was possessed of property of the value of $18,800, or thereabouts. Approximately one-half of the property consisted of mortgages, notes, etc., and the remainder of real estate in Grand Rapids and Dutton, Michigan. Plaintiff owned a house on Adams street in Grand Rapids, of the value of $3,250; another house on Griggs street, Grand Rapids, of the value of $4,000, with a $1,600 incum-

brance against it, and a consequent net value of $2,400; and he owned the homestead where the parties lived at Dutton, Michigan, valued at $1,800. In addition he owned jointly with defendant another house on Union avenue, Grand Rapids, the respective half interests being worth $2,375. Defendant owned the other half of the Union avenue property, and other securities of the value of $3,400. This would make her net worth $5,775. The trial court awarded her plaintiff's one-half interest in the Union street house, or $2,375 as alimony, plus a $100 attorney fee, thus leaving plaintiff with approximately $16,425 and defendant with $8,050. The furniture was to be divided between the parties. The award to defendant not only was for permanent alimony but also for a release of dower in plaintiff's real estate.

While it is impossible to tell with certainty the value of the securities, plaintiff admits that the McKerzie mortgage owned by him is worth $1,500. We believe that in addition to the one-half interest in the Union street property, defendant should also receive the McKerzie mortgage of $1,500, or its equivalent in cash. This will give plaintiff approximately $14,925, while defendant will have a total of $9,550. This should enable each to live in a frugal manner, and not become a public charge.

The decree as modified will be affirmed, with costs to defendant, but without more than the regular attorney fee in this court.

NELSON SHARPE, C. J., and POTTER, NORTH, FEAD, WIEST, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.